An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-526

Filed 4 March 2026

Dare County, No. 22JA000049-270

IN THE MATTER OF: C.C.

Appeals by Respondent-Mother and Respondent-Father from order entered 16 January 2025 by Judge Robert P. Trivette in Dare County District Court. Heard in the Court of Appeals 10 February 2026.

> *Jason Senges, for Respondent-Appellant-Father.*
>
> *Parent Defender Annick Lenoir-Peek, by Assistant Parent Defender Jacky L. Brammer, for Respondent-Appellant-Mother.*
>
> *Clemmons Family Law, by Holly M. Groce, for Petitioner-Appellee Dare County Department of Social Services.*
>
> *Michelle F. Lynch, for the Guardian ad Litem.*

ARROWOOD, Judge.

Respondents appeal from order for termination of parental rights entered 16 January 2025 finding it in the best interests of the child C.C. ("Charlie[1]") due to neglect by both parents. Respondents argue that the district court lacked subject

---

[1] The parties agree to the pseudonym Charlie pursuant to Rule 42(b) of the North Carolina Rules of Appellate Procedure.

matter jurisdiction due to an improperly verified petition, and Respondent-Mother claims that the court failed to make certain findings of fact required by statute. For the following reasons, we find no error and affirm the district court's order.

## I. Introduction

Charlie was born 8 March 2018. On 8 December 2022 Dare County Department of Health and Human Services ("DHHS" or "Department") filed a juvenile petition alleging that Charlie had been neglected. This petition was verified and signed by Jayonna Harris ("Ms. Harris"), a DHHS social worker, before the Deputy Clerk of the Superior Court.

The petition noted that the Department had been involved with the family since it received a Child Protective Service Intake Report 23 June 2020 after Respondent-Mother was issued a citation for drug paraphernalia while intoxicated and riding with Charlie in a cab without a car seat. CPS received additional intake reports on 1 December 2020 and 2 July 2021, concerning domestic violence and Charlie's living conditions respectively. On 12 May 2022, the Department responded to the family's trailer after receiving an intake report of domestic violence and injurious environment, after Respondent-Father told the reporter he was seeking a protective order against Respondent-Mother, who he stated was drinking daily and was physically abusive towards him in Charlie's presence. Respondent-Mother was contacted the following day and stated she was without housing but claimed she was delivering with DoorDash. The Department learned that Charlie had not been seen

by a doctor since September 2020, had not been toilet trained, and continued to require assessment for delayed speech and behavioral issues.

The Department continued to frequently monitor and assist the family throughout the fall and summer of 2022, reporting additional ongoing concerns about domestic altercations, unstable housing, drug abuse, and the parents' consistent failure to follow through with appointments and communication about services Charlie required. The family failed to make any substantial progress on their Family Service Agreement goals, and Charlie was not seen for a wellness visit until 23 November, when he was referred for early intervention and behavioral health services. When the petition was filed, Charlie was staying with Respondent-Father, who was not working, and Respondent-Mother would not provide information about her employment or housing.

On 22 February 2023, law enforcement stopped Respondent-Mother for speeding, with Charlie in the vehicle, and arrested her for possession of drug paraphernalia. DHHS responded to the scene and contacted Respondent-Father, who agreed to keep Charlie in his camper, but requested food for him. It was then determined that Respondent-Mother had been squatting in a residence without permission and had no other alternate housing. Earlier that month, police had been called to remove the family from a motel, where they left drug paraphernalia in their room.

Due to the foregoing series of events and the family's continued noncompliance,

the Department filed a petition dated 23 February 2023 "to remove [Charlie] from his home until this matter can be properly addressed before the court." The amended petition replicates in full the original 27-page petition dated 8 December 2022 and adds five additional pages. The additional pages detailed Respondent-Mother's arrest and both parent's ongoing failure to engage with services for Charlie and provide him stable housing. The first additional page contains the dated signature of Ms. Harris. It is marked "Received by Magistrate" at 4:40 p.m. on 23 February 2023 and signed by Magistrate M.R. Clark ("Magistrate Clark").

Magistrate Clark simultaneously issued a nonsecure custody order, also dated 23 February 2023 at 4:40 p.m. The order noted a "reasonable factual basis to believe" Charlie was at risk based on the "petition and request for nonsecure custody," and listed the extensive efforts by DSS to prevent or eliminate the need for the placement. Magistrate Clark signed the order "M.R. Clark For the Honorable Judge Trivette" in the box marked "Signature of Judge/Judge's Designee" and recorded the time Magistrate Clark received the Judge's telephonic approval for the order that day. The order set the first nonsecure custody hearing for 1 March 2023. On 27 February 2023 DHHS filed a motion to amend the original petition and seek non-secured custody. This amendment was allowed in an order issued 1 March 2023, ordering service of the amended petition via hand delivery and setting both pre-adjudication and adjudication hearings. In issuing the order for continued non-secure custody, the court ordered weekly hourlong supervised visits with both Respondents.

On 3 May 2023, Respondent-Father was absent for the adjudication hearing but Respondent-Mother stipulated to extensive facts, including that Charlie "is a neglected juvenile." On 15 May 2023, the court issued factual findings substantially in accord with the stipulated facts, adjudged that Charlie was neglected, ordered him to remain in custody, and ordered Respondents to cooperate with the Family Services Case Plan.

At the subsequent disposition on 7 June 2023, the court found "the parents continue to have poor communication with the Department, lack appropriate residence to care for Chase, continue to use illegal substances without attending consistent treatment or completing requested drug screens" and "are unable to meet their own needs, let alone the needs of a young child."

Respondents' compliance had not improved by 3 January 2024, when the court made reassuring findings about Charlie's progress in his foster home and changed his primary plan to termination of parental rights and adoption. The court relieved the Department of the obligation to pursue reunification on 24 April 2024. The Department moved to terminate parental rights on 17 July 2024.

After three hearings held between October 2024 and January 2025, the court found by clear, cogent, and convincing evidence that terminating Respondents' parental rights was in Charlie's best interests. The court found that Respondents "have recurring issues with substance abuse and domestic violence since the Department's involvement," "have expressed limited insight regarding the long-term

effects of their substance abuse and domestic violence and how those issues affect their parenting," have not "provided a consistent stable living environment," and "have essentially been repeating the same behavioral patterns and have done minimal to nothing to address the concerning behaviors." On the other hand, the court found that Charlie's adoption by his foster parents "is highly likely and forthcoming pending the termination" and that they had "stated they are committed to providing long term care for [Charlie] and have a strong bond." Respondents filed written notice of appeal on 10 February 2025.

## II. Discussion

### A. The Amended Petition

Both Respondents argue that the trial court lacked subject matter jurisdiction over the case, alleging that the petition dated 23 February 2023 was unverified and thereby deprived the court of jurisdiction in all subsequent proceedings in this case. "The issue of subject matter jurisdiction may be considered by the court at any time, and may be raised for the first time on appeal." *In re T.B.*, 177 N.C. App. 790, 791 (2006). We review questions of subject matter jurisdiction *de novo*. *In re M.C.*, 244 N.C. App. 410, 413 (2015) (citation omitted).

Abuse, neglect, and dependency actions are governed by the Juvenile Code, which requires that such petitions "be drawn by the [DSS] director, verified before an official authorized to administer oaths, and filed by the clerk, recording the date of filing." *In re T.R.P.*, 360 N.C. 588, 591 (2006) (quoting N.C.G.S. § 7b-403(a)). The

properly verified juvenile petition invokes the trial court's jurisdiction, which is then established throughout the proceeding stages of the case, including a termination hearing. *Id*. at 593. A Deputy Clerk of the Superior Court is empowered by statute to administer oaths. N.C.G.S. § 11-7.1.

It is undisputed that, as to the first juvenile petition dated 8 December 2022, the Deputy Clerk administered the verification by Ms. Harris, who properly verified and signed the document. This verification was sufficient to invoke the court's jurisdiction over subsequent proceedings. *See In re T.R.P.*, 360 N.C. at 593.

Respondents are correct that the amended petition does not contain language explicitly stating that its contents were verified by the administration of an oath. The amended petition of 23 February 2023 shows the date and the signature of Ms. Harris, as well as the signature of Magistrate Clark and the time stamp of 4:40 p.m. Also at 4:40 p.m. on the same day, Magistrate Clark issued the nonsecure custody order with telephonic approval from Judge Trivette, pursuant to N.C.G.S. §§ 7B-404, 7B-502, 7B-508. Such nonsecure custody orders may only be issued if the court find "a reasonable factual basis to believe the matters alleged in the petition are true." N.C.G.S. § 7B-503 (2023). Accordingly, the simultaneous order states not only that the court has subject matter jurisdiction to order nonsecure custody "based on the verified petition," but that the court reached conclusions based on the "petition and request for nonsecure custody," that the court found the requisite "reasonable factual basis to believe that the matters alleged in the petition are true," and that it was

therefore contrary to the juvenile's welfare to remain with Respondents.

"Generally there is a presumption that a public official in the performance of an official duty acts in accordance with the law and the authority conferred upon him." *State v. Watts*, 289 N.C. 445, 449 (1976) (citations omitted). Where the trial court acts lawfully, "every presumption not inconsistent with the record will be indulged in favor of jurisdiction." *Cheape v. Town of Chapel Hill*, 320 N.C. 549, 557 (1987) (cleaned up). "The burden is on the party asserting want of jurisdiction to show such want." *Dellinger v. Clark*, 234 N.C. 419, 424 (1951) (citation omitted). A magistrate has the power to administer oaths which verify pleadings such as the amended petition. N.C.G.S. § 7A-292 (2023).

Respondent-Mother argues that the record contains "no indication that the social worker swore an oath that the contents were true in front of anyone authorized to receive oaths." But Respondents were here required to show positive evidence showing that Magistrate Clark neglected to administer the oath, leaving a "want of jurisdiction." *Dellinger*, 234 N.C. at 424. Magistrate Clark was empowered by statute to administer an oath, and the record shows that, in all accompanying details, the court followed the lawful procedure for receiving the petition and issuing the order. Therefore, we decline to disturb the "prima facie presumption of rightful jurisdiction." *In re N.T.*, 368 N.C. 705, 708 (2016) (quoting *Williamson v. Spivey*, 224 N.C. 311, 313 (1944)).

Even if the amended petition had been unverified, this would not have

deprived the court of jurisdiction on these facts. Respondent-Mother relies upon two important jurisdictional decisions to argue otherwise. In the former, our Supreme Court found that where the initial juvenile petition was unverified, the court was deprived of jurisdiction throughout the case, and this Court vacated the void proceeding. *In re T.R.P.*, 360 N.C. at 598. Similarly, in the latter, the Supreme Court found that, where the motion for termination of parental rights was similarly unverified, this deprived the court of jurisdiction over the subsequent termination hearing. *In re O.E.M.*, 379 N.C. 27, 37 (2021).

But neither case is on point, as it is uncontested that both the initial jurisdiction-conferring petition and the motion for termination in this case were properly verified. By comparison, this court considered a closely analogous appeal in *In re J.A.K.*, 242 N.C. App. 383 (2015) (unpublished). The case is instructive on this question. As here, DSS filed an original petition alleging a child was neglected. *Id.* DSS was ordered to take non-secure custody of the child that day. *Id.* Four days later, DSS filed an amended petition reiterating all the allegations from the original petition, adding new allegations after new events came to DSS's attention. *Id.* The parent's parental rights were later terminated. *Id.* The father appealed, arguing that because the amended petition was not verified, the trial court lacked subject matter jurisdiction to enter subsequent custody orders, and therefore, because DSS therefore had no legal custody over the child, it had no standing to terminate parental rights. *Id.* Relying upon *In re T.R.P.*, we determined that his argument was without

merit because the trial court's ongoing subject matter jurisdiction was firmly established by the properly verified initial juvenile petition. *Id.* So too here.

### B.     Termination of Parental Rights

Respondent-Mother argues on appeal that the court abused its discretion in terminating parental rights without making findings on all relevant considerations the evidence placed before the court, as required by statute. N.C.G.S. S 7B-1110(a). Specifically, she argues that the court did make findings as to its alleged failure to order a minimum duration for her weekly visits after the initial non-secure custody order, that Charlie's foster parents were not actually a pre-adoptive placement, and that Charlie's foster parents rejected gifts from the Respondents.

We review the order for abuse of discretion and ask whether the ruling is "so arbitrary that it could not have been the result of a reasoned decision." *In re N.G.*, 186 N.C. App. 1, 10–11 (2007) (quotes omitted). We only reverse a trial court's decision that termination of parental rights is in the child's best interests when this conclusion was "manifestly unsupported by reason." *In re S.N.*, 194 N.C. App. 142, 146 (2008), *aff'd* 363 N.C. 368 (2009).

In juvenile cases, this court does not address findings and conclusions already settled by the trial court's earlier binding orders. *In re Y.Y.E.T.*, 205 N.C. App. 120, 123 (2010). Respondent-Mother's first argument is not preserved for appellate review, as she made no appeal as to numerous prior orders ordering weekly visits, and she is estopped from raising issues resolved by those earlier adjudication and

disposition orders. The court ordered DHHS to arrange weekly hourlong supervised visits with each parent at the first nonsecure custody hearing. Subsequent orders maintained the direction to continue facilitating weekly visits. DHHS generally scheduled visits according to this initial plan unless intervening events made such visits impossible, as when Respondents were incarcerated. Moreover, the record shows Respondent-Mother often failed to appear for visits without notice, even when she was not incarcerated. Whether Respondent-Mother visited with Charlie long enough would have been irrelevant to the court's ultimate decision, where it also found that she attended only 49 of 91 available weekly visitations in the first place.

Respondent-Mother's next arguments concerning Charlie's foster parents are likewise without merit, and we find no abuse of discretion. The record contains evidence that Charlie's foster parents had committed to caring for Charlie indefinitely, which was sufficient to make requisite findings about the "quality of the relationship between the juvenile and the proposed adopted parent[s]." N.C.G.S. § 7B-1110. In its final court report, DHHS reported that the foster parents "are committed to providing long-term care" and expressed their belief that they were "bonded and excited about their future together." The GAL volunteer testified that the foster placement "would lean toward adoption . . . when the proverbial rubber meets the road, they would take him because he's a great kid." The social worker testified that they "say he has a home with them forever, how[ever] long he needs to be there." There is simply no basis to conclude that the court's findings on this

question were manifestly unreasonable. In any event, "[t]he absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights." *In re D.H.*, 232 N.C. App. 217, 223 (2014).

The record mentions Charlie's foster parents rejecting some of Respondent Father's gifts because his room was getting crowded with toys. The court heard testimony that both Respondents agreed not to bring any additional toys. But Respondent-Mother has failed to show that this was ultimately relevant to the court's findings. Even if Respondents had brought a toy every time they visited Charlie, the court could have reasonably reached its decision to terminate their parental rights given the overwhelming evidence that "[t]here has been no progress by either Respondent."

## III. Conclusion

For the foregoing reasons, we find no abuse of discretion in the court's decision to terminate Respondents' parental rights, and that the court had subject matter jurisdiction throughout proceedings. Accordingly, we affirm the trial court's orders.

AFFIRMED.

Judges CARPENTER and GORE concur.

Report per Rule 30(e).